THE JUVENILE SHOE CORPORATION OF AMERICA, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 21255. Promulgated January 17, 1952.

*Darrell D. Wiles, Esq.*, for the petitioner.
*Frank M. Cavanaugh, Esq.*, for the respondent.

### OPINION.

LEMIRE, *Judge:* The Commissioner determined deficiencies in petitioner's income tax for the fiscal years ended October 31, 1945, and 1946, in the amounts of $5,962.50 and $619.75, respectively, and a deficiency of $279.81 in excess profits tax for the fiscal year ended October 31, 1946. The deficiencies for the fiscal year ended October 31, 1946, are conceded. The sole question presented is whether the Commissioner erred in his determination that the petitioner realized long term taxable gain upon the sale of its treasury stock to Alex Kaiser, its vice president and general manager, during the fiscal year ended October 31, 1945. It is conceded that the gain from the trans-

action, if taxable, is $23,850. All of the facts are stipulated and are found as stipulated.

The petitioner is a Missouri corporation organized in 1918. It keeps its books and files its Federal income tax returns on a fiscal year basis ending October 31. Its returns for the taxable years involved were filed with the collector of internal revenue for the first district of Missouri.

It is engaged in the manufacture of shoes, with plants located at Aurora and Sarcoxie, Missouri, and with sales offices in St. Louis, Missouri.

The petitioner's amended articles of association authorize it, among other things, "to purchase, hold, sell and transfer shares of its own capital stock."

Petitioner's original capital stock consisted of 9,250 shares of preferred stock of the par value of $25 per share and 5,000 shares of common stock of a par value of $1 per share. All of the outstanding preferred stock was reacquired and retired by the petitioner on or before July 1, 1944.

On July 13, 1939, petitioner entered into a written contract to employ Joseph J. McBryan as sales and merchandise manager at a salary of $12,000 per year. One of the conditions of that contract required petitioner to transfer to McBryan 600 shares of its common stock. Under the terms of the contract McBryan could not sell the stock and when his contract of employment was terminated and other conditions of the contract fulfilled he was required to transfer it back to the petitioner.

At the time this contract was entered into all of the authorized common stock had been issued and outstanding and petitioner had no treasury stock. On July 30, 1939, the petitioner purchased 600 shares of its common stock from Charlotte E. Reith for the sum of $3,333.33. She was the wife of the president of the company and at that time owned 2,585 shares of petitioner's common stock. On September 30, 1939, the shares so purchased were transferred to McBryan pursuant to his contract of employment. The book value of the common stock on May 31, 1939, and October 31, 1939, was $13.78 and $16.09 per share, respectively. Petitioner's profits before taxes for the fiscal year ended October 31, 1939, were $62,554.

On March 15, 1940, McBryan tendered his resignation as sales and merchandise manager and as vice president and director of petitioner and terminated his employment contract. Thereupon, he transferred back to the petitioner the 600 shares of common stock originally transferred to him under his contract of employment. These shares were represented by certificate issued in the name of petitioner and were held by it as treasury stock from on or about March 15, 1940, to on

or about January 10, 1945. The shares were not voted and were not carried on the books as an asset and no dividends were paid thereon.

On December 1, 1944, Alex Kaiser entered into the employment of petitioner as a vice president and on or about January 10, 1945, 100 of the above-mentioned 600 shares of treasury stock were sold to him at a price of $40.75 per share. Thereafter, on March 2, 1945, the remaining 500 shares were sold to him at the same price per share. The book value of petitioner's common stock as of October 31, 1944, was $41.93. Its profits before taxes for the year ended October 31, 1944, were $90,558.

So far as the evidence shows the transfer of the shares to Kaiser in 1945 was an outright sale to him with no terms, conditions, or restrictions attached. On January 28, 1946, Kaiser sold the 600 shares of common stock hereinabove mentioned back to the petitioner at the same price he had paid therefor and on or about April 30, 1946, terminated his employment with the petitioner. The book value of petitioner's common stock on October 31, 1945, and October 31, 1946, was $44.26 and $49.35 per share, respectively. Petitioner's profits before taxes for those years were $88,359 and $74,974, respectively.

In purchasing the above stock Kaiser paid the petitioner $12,450 in cash and gave a personal note for the balance of $12,000. The ledger entries made on the books of the petitioner in connection with Kaiser's purchase and subsequent resale of the shares of stock were as follows:

1-10-45

| | | |
|---|---|---|
| Dr. cash | $4,075 | |
| Cr. treasury stock | | $100 |
| Cr. surplus | | 3,975 |

3-2-45

| | | |
|---|---|---|
| Dr. notes receivable | 12,000 | |
| Dr. cash | 8,375 | |
| Cr. treasury stock | | 500 |
| Cr. surplus | | 19,875 |

1-28-46

| | | |
|---|---|---|
| Dr. treasury stock | 600 | |
| Dr. surplus | 23,850 | |
| Cr. cash | | 24,450 |

During all of the years 1939 through 1945, all of petitioner's common stock except 90 shares was owned by executive employees of petitioner or jointly by such employees and their wives, or solely by the wife of an employee or by a widow of a former employee. No understandings or agreements between stockholders and petitioner (except the McBryan contract of July 13, 1939) or between individual stockholders of petitioner, restricting the sale of petitioner's common stock, were in effect prior to the close of petitioner's fiscal year ended October 31, 1945.

Respondent urges that under section 22 (a) of the Internal Revenue Code,[1] as construed in Regulations 111, section 29.22 (a)–15,[2] petitioner is subject to tax on the long term capital gain realized on its sale to Kaiser during the taxable year 1945. Petitioner contends that in its transaction with Kaiser it was not dealing in its own stock as it might in the shares of another corporation and therefore is not taxable under the regulations. Petitioner argues that it must be inferred from the stipulated facts that Kaiser was under a contractual obligation to resell the stock to petitioner on leaving its employment. However, there is nothing to that effect in the stipulated facts, or elsewhere in the evidence, and we cannot so find. In support of his contention petitioner cites, among other cases, *H. W. Porter & Co.*, 14 T. C. 307, revd. (C. A. 3) 187 F. 2d 939; *Batten, Barton, Durstine & Osborn, Inc.*, 9 T. C. 448, revd. (C. A. 2) 171 F. 2d 474; and *Rollins Burdick Hunter Co.*, 9 T. C. 169, revd. (C. A. 7) 174 F. 2d 698.

We held on the facts in each of those cases that the taxpayer was not dealing in its own stock "as it might in the shares of another corporation" (Regs. 111, sec. 29.22 (a)–15), and was not taxable on the transaction. The appellate courts reversed. While the instant case is in some respects similar to those cases the crucial facts are different. Here there was no restriction on the sale or resale of petitioner's shares either by the petitioner or its stockholders. Neither was there any change in petitioner's capital structure by reason of petitioner's sale of the shares to Kaiser or the purchase of those shares

---

[1] SEC. 22. GROSS INCOME.

(a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. In the case of Presidents of the United States and judges of courts of the United States taking office after June 6, 1932, the compensation received as such shall be included in gross income; and all Acts fixing the compensation of such Presidents and judges are hereby amended accordingly. In the case of judges of courts of the United States who took office on or before June 6, 1932, the compensation received as such shall be included in gross income.

[2] Sec. 29.22 (a)–15. ACQUISITION OR DISPOSITION BY A CORPORATION OF ITS OWN CAPITAL STOCK.—Whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction, which is to be ascertained from all its facts and circumstances. The receipt by a corporation of the subscription price of shares of its capital stock upon their original issuance gives rise to neither taxable gain nor deductible loss, whether the subscription or issue price be in excess of, or less than, the par or stated value of such stock.

But if a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another. So also if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property. Any gain derived from such transactions is subject to tax, and any loss sustained is allowable as a deduction where permitted by the provisions of the Internal Revenue Code.

from him. As a whole, the facts in the instant case are more like those in *Brown Shoe Co.*, 45 B. T. A. 212, affd. 133 F. 2d 582. There we held the taxpayer taxable on the profit realized on the sale of its own shares to its president and other key employees where, as in the instant case, there was no alteration of the taxpayer's capital structure and no restriction on the sale of the shares. In *Batten, Barton, Durstine & Osborn, Inc.*, *supra*, we pointed out that the facts were clearly distinguishable from those in *Brown Shoe Co.*, *supra*.

We need express no opinion as to our present willingness to accede to the views of the respective appellate courts in the above cited cases since, on the facts in this case, the issue must in any event be decided for the respondent.

*Decision will be entered for the respondent.*